EDWARD FORNEY, Individually and as Adm'r of the Estate of Jamie L. Forney, Deceased, Plaintiff-Appellant, *v.* JEFFREY CALVIN *et al.,* Defendants-Appellees.

First District (2nd Division) No. 60514

Opinion filed December 16, 1975.

Raymond P. Concannon, of Chicago (Miller and Concannon, of counsel), for appellant.

Joseph B. Lederleitner, of Chicago (Pretzel, Stouffer, Nolan & Rooney, of counsel), for appellees.

Mr. PRESIDING JUSTICE DOWNING delivered the opinion of the court:

A wrongful death action was brought by plaintiff on behalf of his deceased daughter, Jamie, against Jeffrey Calvin (defendant), the host driver in whose automobile the deceased was a passenger. Jeffrey's father, Robert, and the driver of the other automobile involved in the occurrence, Lucio Ramirez, were also named as codefendants. The Calvins brought suit against Ramirez who then brought suit against

Jeffrey Calvin. All actions were consolidated and tried together. The trial court granted a directed verdict on all actions but the wilful and wanton count in plaintiff's case against the defendant.[1] The jury found for the defendant, which verdict is challenged on appeal. None of the other verdicts are so challenged.

The issues presented for review are:

(1) whether the trial court erred in the admission of certain evidence;

(2) whether the court erred in instructing the jury;

(3) whether the court erred in denying plaintiff's motion for a directed verdict that defendant was guilty of wilful and wanton misconduct; and

(4) whether the jury's verdict that defendant was not guilty of wilful and wanton misconduct was against the manifest weight of the evidence.

Just before dusk—about 8:30 p.m.—on July 1, 1970, a red 1966 Chevrolet four-door sedan, operated by Ramirez, travelling northwest on the inside lane of U.S. Highway 14 (also known as Northwest Highway) in Palatine, Illinois, collided with the right side of a dark green 1967 or 1969 MG two-door sedan, operated by defendant, travelling north on Quentin Road, in which plaintiff's decedent was riding as a passenger. It was undisputed that northbound traffic on Quentin was controlled both by a stop sign on the southeast corner of Quentin and Route 14 and a red flashing light suspended in a light fixture by a cable or cables over the center of the intersection, and that the northwest-bound traffic on Route 14 was controlled by an amber flashing light in the same light fixture facing southeast. It was stipulated that the collision was the cause of Jamie's death.

The investigating officer, an Illinois State trooper, determined, through his post-collision measurements and interview with Ramirez, the distances the vehicles had travelled after impact. Defendant's MG came to rest 252 feet from the point of impact and 18 feet south of Route 14, while Ramirez's Chevrolet came to rest 144 feet from the point of impact in a Sinclair station on the northwest corner of Route 14 and Quentin after knocking down a gas pump and a flagpole. The trooper testified a fire resulted at the Chevrolet's resting place. He was unable to uncover any eyewitnesses to the collision. He measured Route 14, a four-lane highway, at 44 feet wide and Quentin Road, a two-lane road at 18 or 19 feet wide. The speed limits governing the intersection were 50 m.p.h. for southeastbound Route 14, 55 m.p.h. for northwestbound Route 14, and 45 m.p.h. for north and southbound Quentin Road.

---

[1] The record indicates Robert Calvin settled his property damage claim against Ramirez. Plaintiff also settled with Ramirez for his insurance policy limit of $10,000.

The record established that southeast of Quentin, Route 14 inclines upward towards the intersection, affecting the visibility of a vehicle stopped at the stop sign on the southeast corner of the intersection. Defendant, who had travelled Quentin before, testified to his ability, on occasions prior to the collision when stopped at the stop sign, to see southeast down Route 14 to a bend in the road which he estimated at trial as "a couple of blocks away" and at his deposition as "300 yards away." Plaintiff presented evidence on rebuttal that the bend was .23 miles or 1232 feet southeast of the intersection as measured by a car odometer.

Defendant testified he had driven the MG for ten months prior to the collision and was familiar with the intersection, stop sign and flashing lights for ten years. As to the occurrence itself, defendant asserted he could remember nothing beyond driving north on Quentin until he woke up in the hospital the day after the collision. Defendant attested he was knocked unconscious in the collision, and that he had a concussion. Defendant's post-collision examining physician stated that in his opinion defendant had symptoms of retrograde amnesia as to the collision.

Ramirez testified he had lived in Palatine four and a half years prior to driving home on Route 14 at "about 45" m.p.h. with a "clear and open view" of the intersection. He did not, before reaching the intersection, see any other traffic travelling in either direction on Route 14. Neither did he see the MG as an automobile before the collision, although he did see a brown or black "blur" or "something black" ten feet in front of him as he approached the intersection. While he neither sounded his horn nor applied his brakes, he did not hear any other horn sounding either.

Defendant's counsel called a Walter Oliver, a consulting engineer, to testify as a second witness in an afternoon session of the trial. The record shows defendant's counsel had not decided, prior to adjournment for lunch, whether to call Oliver. In conference immediately after lunch, plaintiff's counsel moved to be allowed to depose any expert defendant might call. Defendant's counsel advised the court the witness would only testify to the seconds which elapse when automobiles travel certain distances at different rates of speed and to specifications of the MG at issue. The court denied the motion to depose subject to testimony adduced from Oliver not exceeding these limitations.

After eliciting Oliver's qualifications, including his qualifications to calculate the seconds it will take a vehicle to cover a certain distance, the following testimony ensued:

"Defendant's counsel: Sir, are you qualified or let me put it this way, can you given a distance and a speed of a vehicle, calculate how many seconds it will take that vehicle to cover a distance?

A. I can.

Q. May I ask you to assume these facts, 1,000 feet, a vehicle travelling * * * 70 miles an hour.

Plaintiff's counsel: I object to this, there's been no testimony in this record of 70 miles an hour; hypothetical must be based on the record.

The Court: That's right.

Defendant's counsel: I'm not asking him—I'm asking him what the speed of the vehicle is, I'm going to go right down the line.

The Court: Why don't you get right to the point. There's no testimony 70 miles an hour vehicle, you going to tie this in?

Defendant's counsel: I later will.

Ramirez's counsel: I have an objection, Judge. It's not really a question for expertise, it's well known how many feet are in a mile and after you take out a little bit of arithmetic and multiply and I don't understand.

The Court: That objection will be overruled. I'll reserve a ruling subject to his connecting it up.

Defendant's counsel: How many seconds will it take a vehicle travelling 70 miles an hour to cover a distance of 1,000 feet."
The witness then testified that 1,000 feet would be covered in 11.5 seconds at 60 m.p.h., 13.5 seconds at 50 m.p.h. and 15.2 seconds at 45 m.p.h. He further asserted that 800 feet would be covered in 7.8 seconds at 70 m.p.h., 9.1 seconds at 60 m.p.h., 10.9 seconds at 50 m.p.h. and 12.1 seconds at 45 m.p.h. Defendant's counsel asked Oliver for the height of the roof of a 1967 MG which information had been obtained by subpoena. Oliver responded 49.3 inches off the ground, though he noted it would be less when weight is added in the vehicle and depending on tire inflation. On cross-examination, Oliver testified 1,232 feet would be covered in 19 seconds at 45 m.p.h. After Ramirez's counsel questioned Oliver about a 10 m.p.h. figure and, in response to an inquiry of the court, asserted the figure was "pulled out of the air," the court remarked, "[w]e're beginning to speculate."

The next witness for defendant was a Mrs. Montgomery who testified that on the day in question, she was headed northwest on Route 14. When she was about 200 feet from the intersection, she looked in her inside rear view mirror and then glanced at her outside rear view mirror.

She was preparing to turn right [or north] on Quentin and was specifically checking the entrance to a subdivision on the north side of Route 14 about 1,000 feet from the intersection to make sure no one came out of the entrance fast and hit her as she made her turn. After looking in her mirrors and determining no one was behind her, she observed a little dark green car stopped at the stop sign on the southeast corner of the intersection. The nose of the green car, she asserted, was "just a little beyond the stop sign." She again checked her mirrors, again saw no vehicles and focused attention on the green car to make sure the driver of the car "didn't dart out and try to follow me on my bumper, which he didn't do, and I made my right-hand turn on Quentin." After turning the corner and proceeding north on Quentin less than 200 feet, she heard a noise she described as "like an explosion." She looked in her inside rear view mirror and pulled over to the side to stop. While looking in her mirror she saw the reflection of a vehicle she hadn't seen before going through the Sinclair station, hitting the gas pumps and catching on fire. She did not see the green car at all after turning.

Mrs. Montgomery was unable to state the speed of the vehicle she hadn't seen before in miles per hour, although she characterized its speed as "super fast." She later also asserted she was a "hazy" judge of distance and not proficient at measuring in seconds; that she had been driving for 19 years; and that when, on occasions prior to the collision, she had pulled up in her Volkswagen to the stop sign she asserted defendant was stopped at, she had been able to see the rooftops and windowtops of vehicles approaching northwestbound on Route 14. She considered it a very dangerous intersection.

After the parties had rested, plaintiff moved to strike Oliver's testimony regarding speeds and distances, pointing out it had not been connected up with facts later adduced. Defendant's counsel asserted excessive speed by Ramirez could be inferred from Mrs. Montgomery's testimony that she did not see anyone prior to her turn since, if true, Ramirez could not have been anywhere near the intersection when defendant pulled out if Ramirez had been going 45 m.p.h. The court denied this motion.

Defendant's counsel, in his closing argument, made many references to how "fast" the Ramirez vehicle was travelling, asserting both that it was so testified to by Mrs. Montgomery and was obvious from the damage done to the vehicles. Plaintiff's objection to comments other than those based on testimony of Ramirez travelling at 45 m.p.h. was overruled. Defendant also argued Oliver's testimony supported Mrs. Montgomery's contentions as to how fast the Ramirez car was travelling.

38

I.

We first consider whether the court erred in admitting and not striking the expert opinion testimony of witness Oliver. At the time Oliver testified there were no supporting facts in the record upon which to base his testimony. The trial court also denied plaintiff's motion to strike the testimony upon defendant's failure to connect up the testimony. The plaintiff contends Ramirez's assertion that he was travelling at 45 m.p.h. was never rebutted by a witness who saw the accident, that no facts supporting the expert opinion testimony were ever adduced and that it was thus error both to allow the testimony in advance of supporting facts and not to strike the testimony. Defendant contends Oliver's testimony was not expert opinion and, even if it was, allowing expert opinion in advance of supporting facts is discretionary with the trial judge. Defendant further contends the opinion testimony was here supported subsequently by the testimony of Mrs. Montgomery, that Ramirez was going "super fast."

Defendant's attorney's characterization of Oliver's testimony, both in his brief and at oral argument, as other than expert opinion is a specious argument. Our review of the testimony of Oliver clearly indicates that defendant brought forth from the witness the education and work experience data which along with the type of questions could only suggest the qualifying of an expert witness. Oliver was called as an expert to state his opinion as to how many seconds it takes a vehicle to traverse 1,000 feet and 800 feet at different speeds. Oliver had no personal knowledge of any of the facts in the record.

■■ While a witness may normally only testify as to facts within personal knowledge, an exception is made for opinions of experts in which they may draw inferences from facts which jurors would not be competent to draw. The safeguard on the reliability of such testimony is that the expert's opinion must be based on facts adduced or to be adduced and not on "mere conjecture." *Schwartz v. Peoples Gas Light & Coke Co.* (1st Dist. 1962), 35 Ill.App.2d 25, 31-32, 181 N.E.2d 826.

■■ In order to warrant reversal for this reason, it is necessary to show that prejudice resulted from the trial court's allowing expert opinion testimony to be elicited in advance of supporting facts. In *Gibson v. Healy Brothers & Co.* (1st Dist. 1969), 109 Ill.App.2d 342, 353-54, 248 N.E.2d 771, this court cautioned against such a procedure, but did not find it prejudicial. The *Gibson* court reversed on other grounds and stated its assumption the procedure would not be repeated on remand. Also this court found no prejudice where it perceived the trial court

made conscientious efforts to assure that no party had been prejudiced by permitting an expert witness to answer hypothetical questions based upon facts not previously admitted into evidence when supporting evidence was later admitted. *Jamison v. Lambke* (1st Dist. 1974), 21 Ill. App.3d 629, 636, 316 N.E.2d 93.

Prejudice is determined, where witnesses are called out of order as here, by whether the opposing party is thus deprived of the right to fully cross-examine the witness. (*Carlson v. New York Life Insurance Co.* (2d Dist. 1966), 76 Ill.App.2d 187, 202, 222 N.E.2d 363.) The figures Oliver testified to consisted of undisputed mathematical calculations, thus rendering plaintiff's untraversed terrains of cross-examination as to their actual accuracy negligible. Plaintiff was, however, deprived by the sequence of witnesses allowed here, of the opportunity of further developing Oliver's opinions in light of Mrs. Montgomery's testimony.

■■ Prior to Oliver's testimony, only Ramirez testified that he was travelling at 45 m.p.h. Mrs. Montgomery later testified Ramirez was travelling "super fast"—but could not define that in terms of specific miles per hour. Likewise the element of distance travelled, 1,000 and 800 feet, had no support in the record when Oliver testified. In this case the testimony of Oliver wherein he was permitted to give calculations of speeds of 70, 60 and 50 m.p.h. without any support in the record, clearly presented to the jury—on this critical issue—calculations which were improper and in our opinion prejudicial. The jury had to decide the question of whether Ramirez was travelling at an excessive speed. To permit questioning about excessive speeds not supported by the record in our opinion was an improper procedure. This is especially true when the trial court fails to strike the unconnected testimony. Indeed, in closing argument defendant placed special emphasis on the contention Ramirez was speeding, referring to speeds in excess of 45 m.p.h.

We think the circumstances here amounted to prejudice of the plaintiff's right to a fair trial. We thus hold that the court erred both in initially admitting Oliver's testimony in advance of supporting facts and in not striking Oliver's testimony after plaintiff failed to connect up with supporting facts as promised.

■■ In so holding, we do not, in any way, detract from the rule in Illinois that a witness may approximate the speed of vehicles as "fast" or "slow" or similar variations where the witness is unable to do so in specific miles per hour. *Ryan v. McEvoy* (1st Dist. 1974), 20 Ill.App.3d 562, 568, 315 N.E.2d 38; *McKenna v. Chicago City Ry. Co.* (1921), 296 Ill. 314, 321-22, 129 N.E. 814; *Hester v. Goldsbury* (1st Dist. 1965), 64 Ill.App.2d 66, 70, 212 N.E.2d 316.

## II.

As we are remanding this case for a new trial, the only other issue which needs comment involves the question of whether the trial court committed error in refusing plaintiff's tendered instructions on the statutory duty to sound one's horn. (Ill. Rev. Stat. 1969, ch. 95½, par. 12—120 (section 12—120 of the Illinois Vehicles Code, effective July 1, 1970), formerly Ill. Rev. Stat. 1969, ch. 95½, par. 212, section 115 of the Uniform Act Regulating Traffic on Highways).) The trial court refused plaintiff's tendered instruction concerning a person's statutory duty to sound a horn.[2] Plaintiff objected to this refusal on grounds that defendant had said he could on prior occasions see for two blocks and should have seen the Ramirez vehicle coming and sounded his horn.

In support of its contention that the instruction should have been given, plaintiff cites *Maddox v. Smith* (2nd Dist. 1966), 67 Ill.App.2d 374, 214 N.E.2d 5 where it was held that an instruction as to the statutory duty to sound one's horn should have been given. However, in *Maddox* the court held that under the circumstances of that case the failure to give the instruction was not prejudicial error since another given instruction did contain some reference to the use of the horn.

■■ In the present case, plaintiff produced no evidence showing defendant in fact saw the Ramirez vehicle prior to the collision. Defendant could not remember the occurrence at all and thus provided no such evidence. In the absence of such evidence, the court was justified in concluding no question of fact existed that it was "reasonably necessary to insure safe operation" to "give audible warning" especially since the statute requires the car operator to refrain from using the horn otherwise. (Ill. Rev. Stat. 1969, ch. 95½, par. 12—120.) In our opinion, based on the record before us, the trial court did not err in refusing to so instruct.

For the reasons set out above we hereby reverse the judgment of the circuit court of Cook County and remand this cause for a new trial. Since only the wilful and wanton misconduct count in the case between plaintiff and defendant is before us, our action pertains only as to that count.

Judgment reversed and remanded.

STAMOS and LEIGHTON, JJ., concur.

---

[2] The instruction was IPI—60.01 embodying section 12—120 (Ill. Rev. Stat. 1969, ch. 95½, par. 12—120).