JOHN REGAS, Plaintiff-Appellant, *v.* KEN LINTON, d/b/a Linton Brothers, Defendant-Appellee.

First District (2nd Division)    No. 77-1927

Opinion filed May 15, 1979.

8

Patrick Dwyer, of Chicago (William J. Harte, Ltd., and Ludwig E. Kolman, of counsel), for appellant.

Keith & Greenblatt, of Chicago (Lewis B. Greenblatt and Joanne F. Hurley, of counsel), for appellee.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff appeals from a jury verdict rendered for defendant in an action to recover damages caused by a fire which partially consumed plaintiff's building. The gravamen of plaintiff's case was defendant's alleged negligence in the operation of an oxyacetylene torch utilized by defendant's employees in removing certain fixtures from the building. The issues presented for review involve questions of whether the trial court erred in its rulings on objections to certain evidence, in improperly commenting on certain other evidence, and in refusing to give a certain jury instruction submitted by plaintiff.

We reverse and remand with directions for the reasons which follow.

Testimony adduced from certain witnesses reveals the essential facts which follow. Plaintiff, John P. Regas, owned one of several commercial buildings at 305-15 W. Grand Avenue in Chicago on October 19, 1973, the date of the fire. The referenced building, the largest standing on the property, and the only one involved in this case, contained six stories and was constructed with exterior brick and completely wooden interior

columns, floor beams, joists and floors. Plaintiff intended to remodel the property from its original use as a commercial steam laundry into showrooms for professions and occupations such as architecture, design, art and art galleries.

At the time of purchase by plaintiff some six months before the fire, the building housed a number of laundry-related fixtures, including metal pipes which were previously connected with tanks, hooks, ceiling runners and other types of fixtures required to be removed prior to the remodeling. On August 13, 1973, plaintiff entered into a written contract with defendant Kenslow Linton, then doing business as Linton Brothers, engaged in trucking and demolition services. Defendant was to remove the fixtures and other types of rubbish and debris. Work began shortly after the contract date, commencing on the first floor of the building and moving upward. By October 19, 1973, defendant's crew had reached the fifth floor.

Elevators were located on the rear, south wall of the building to the east of which was situated an electrical room or closet. Defendant and his crew started work at 8:30 on the morning of the casualty. Upon entering the building, they saw no fire or any unauthorized persons therein. Defendant supervised the removal of pipes running across the top of the fifth floor ceiling. His crew consisted of two men, one of whom was operating an oxyacetylene torch used to cut the steel pipes from the ceiling; they would then fall to the floor. The floor was wetted down with water as a safety precaution. The pipe was then cut into shorter lengths for removal. When the torch was used in this way, it was hot enough to melt the pipes, turning the metal red at the point of application. When the torch was removed, the metal would cool off. No protective metal shields were placed around the cutting work as it was being performed.

There were holes in the floors where previously removed vertical pipes used to supply water to laundry tubs had run up and down through the building. The pipes had been located all around the perimeter of the building, clustered together in sections, in most instances next to large support columns, some of which were located on the fifth floor near the elevator. In front and to the north of the elevator were two openings measuring 3' by 3' each, which had previously accommodated laundry chutes, utilized for dropping laundry bundles to lower floors. Defendant allegedly was seen by plaintiff dropping whatever object he was cutting through the laundry chutes, which he denied. Whether the chute openings were covered or not was also in controversy. The pipe openings were not covered. On the first floor, against the south wall and east of the elevator was a rubbish pile. The composition of the pile was in conflict. There was some evidence that it consisted in part of paper, lint, cotton and wood. This pile was located in the vicinity of the elevator and near the

openings created by the removal of vertical pipes and the laundry chutes; in other estimates, however, it was as far away as 25 to 30 feet.

After working for approximately one hour in which more than 10 pipes were cut, varying in diameter from one to two inches, defendant left the fifth floor in order to fill some buckets with water for use as a wetting agent in the work area. As he descended he smelled smoke, stopped the elevator, opened the doors to the first floor, and saw flames come right into the elevator. The entire floor was smoking. Defendant removed an old mover's pad which had been on the elevator and smoothed out a path which permitted him to run out without stepping into the fire. After he exited the building, he called to his employees and they, too, got out without injury. He then ran to a nearby store in order to telephone the fire department. He reportedly told the storekeeper that "* * * he had set the building on fire with a torch," a statement defendant could not recall having made and later denied making.

The fire department arrived at the scene; however, before the fire was struck, a considerable portion of the building had burned, mostly in the rear or south half, with the roof in that area having burned completely through. The south stairwell was destroyed and portions of the flooring on various levels were completely burned. Other areas were charred. The building was later demolished.

Additional specific evidence will be considered in conjunction with the resolution of the various issues raised.

Plaintiff's theory of the case is that as defendant's crew was cutting pipe on the fifth floor with the oxyacetylene torch, molten metal was ejected from the pipe, found its way to one of the various holes in the floor near the cutting area, and fell through the openings of the various floor levels to the first floor where the metal fell directly onto or bounced into the rubbish pile situated on the first floor in proximity to those holes. The alleged proximate cause of the blaze was defendant's negligence in failing to screen the cutting area or otherwise sufficiently confine the molten metal residue and reduce or eliminate its incendiary potential. Plaintiff identifies a variety of rulings by the court and claims that each detracted from or precluded his proofs and at the same time strengthened defendant's. Although each would be grievous error in any trial, plaintiff argues, where the issue of liability is as close as in the present case, each became reversible error, relying upon *Gabosch v. Tullman* (1974), 21 Ill. App. 3d 908, 316 N.E.2d 226.

Plaintiff complains that the trial court prejudicially restricted the direct examination of plaintiff's expert witness, Charles Lemme, a professional engineer to whose qualifications the defense stipulated. Through Lemme plaintiff sought to prove that byproducts of the oxyacetylene torch pipe cutting included sparks and molten globules of

metal, and in setting a preliminary foundation for a hypothetical question, Lemme was permitted to explain in detail the physical processes involved. When the torch is so used the process actually removes metal from the existing piece. This is done by directing a very hot flame against the cutting object until the temperature of the pipe is raised high enough so that it will burn somewhat in excess of 1000 degrees Fahrenheit. When the base metal reaches that heat, a lever on the cutting torch is then depressed by the operator which causes pure oxygen to be applied to the metal impinging upon the hot steel and causing it literally to burn. The metal that is heated is oxidized and is blown out in the process, exiting in the form of sparks and molten globules. The length of time that molten globules will stay hot after they have exited from the cut on the pipe depends upon their size; very small ones cool down in a few seconds; larger ones can stay above 1000 degrees Fahrenheit for up to several minutes depending upon their size. Wood, paper or cloth, all consisting of cellulose, have ignition temperatures in a range of between 900 to 1000 degrees Fahrenheit.

A hypothetical question was put to Lemme by plaintiff's counsel as follows:

"Q. Now, I am going to ask you a hypothetical question, and I am going to ask you to assume certain facts on that question. I want you to assume that workmen * * * are working with a cutting torch on the fifth floor of a building. On the fifth floor of that building, there are holes in the floor which have not been sealed or closed off * * * and I am going to ask you how long it would take to have a molten globule of metal, like you have just mentioned, fall from the fifth floor to the first floor of the building in which they are working?"

Defense counsel objected to the foregoing hypothetical question on the ground among others that there was no testimony as to molten metal dropping through the holes or their sizes, maintaining that the only evidence relating to the operation was that sparks fell, rather than molten globules. The court sustained the objection and required the witness to testify employing only the term "sparks" rather than molten globules. Plaintiff asserts that this improper restriction denied him his right to have the jury fairly appraise his theory of the case.

■■ Plaintiff maintains that the court misapplied the requirement of evidentiary foundation for hypothetical questions in that the test of whether there was sufficient undisputed physical evidence to provide the necessary basic data for the application of scientific principles does not preclude an expert from inferring from facts in evidence other facts which his expertise assures him exist and then basing his opinion upon the cumulation of such facts, relying upon *Forney v. Calvin* (1975), 35 Ill.

App. 3d 32, 38, 340 N.E.2d 603. In *Forney* the court stated that although a witness may normally testify only as to facts within his personal knowledge, opinions of experts are an exception and they are permitted to draw inferences from facts which jurors would not be competent to draw. Plaintiff also relies upon *Theesfeld v. Eilers* (1970), 122 Ill. App. 2d 97, 105, 258 N.E.2d 39, for a similar proposition. Defendant contends that only sparks were referred to as having been emitted from the cutting operations; no witness testified to the actual presence of molten globules. He points to his own testimony that the torch only gave off sparks and rejected the suggestion that there were any "hunks of metal" present which could have remained molten for as long as several minutes. This ignores the uncontradicted expert testimony to the effect that molten metal is expelled from the cutting path of the torch in the process of parting the pipes into lengths and that this hot metallic emission took the form not only of moving sparks but molten globules of metal as well. Defendant's expert witness, Harvey Gillerman, testified that "slag," pieces of oxidized and melted metal heated from 2800 to 3400 degrees Fahrenheit, is ejected from pipe cutting operations, although he questioned their capacity to start this fire. The fact that defendant saw neither molten globules nor slag does not explain their absence to the exclusion of their consideration by the jury as a potential proximate cause of the fire. Defendant also refers to the testimony of another witness, Roger Brinkerhoff, who saw sparks being emitted from the oxyacetylene torch on the morning of the fire from a distance about one-half block away. When questioned on cross-examination as to the size of the sparks that he saw falling, however, he stated that they would have had to have been fairly large to have been seen by him from that distance.

The trial court should have allowed plaintiff's expert the latitude of testifying to the probable existence of molten globules as byproducts of cutting metal pipe by oxyacetylene torch together with their concomitant longer lasting incendiary characteristics than those possessed by sparks alone. (*Forney v. Calvin; Theesfeld v. Eilers.*) With this evidence the jury could have found that defendant's operations were conducted negligently and that, in the absence of effective safeguards, they were the proximate cause of the resultant fire. For this reason, the jury verdict must be reversed and the cause remanded for a new trial.

Because there must be a new trial, we will consider other alleged errors committed during the trial.

Plaintiff claims error in rulings by the trial court with respect to certain statements made by defendant. An attempted impeachment came after defendant had testified that he did not know whether the fire had started by reason of sparks emanating from the oxyacetylene torch, or

not. When examined in a pretrial deposition, defendant gave the following answer to a question of how the fire started:

"Well, we was trying to come to a conclusion on that. We don't know definitely, but we seemed to think that the cutting had to do something on that. We don't know definitely. That is the only other thing we can figure out."

Plaintiff contends that the statement should have been admitted in the course of defendant's testimony as a prior inconsistent statement. Defendant's objection that the statement was not impeaching was sustained and excluded from evidence. We fail to see how the statement was inconsistent with defendant's earlier testimony. The trial court's ruling in this regard was correct.

■■ Plaintiff asserts that the jury should have been permitted to consider the above-cited statement as an admission against interest, relying upon *Asher v. Stromberg* (1966), 78 Ill. App. 2d 267, 223 N.E.2d 300. In *Asher*, the defendant doctor upon learning that he was about to be taken off a case, told plaintiff that "as far as he was concerned he may have been at fault and that he had an insurance policy of $100,000 for malpractice." That language is clearly dissimilar to the language here under consideration which is too vague, indefinite and conditional to be considered an admission. Defendant cites cases which suggest that unless such statements are definite, positive and unequivocal in character, they cannot be admitted in evidence, principally *Hudson v. Augustine's, Inc.* (1966), 72 Ill. App. 2d 225, 237, 218 N.E.2d 510. We agree. Although wide latitude must be granted in construing statements as admissions and must be analyzed on a case-by-case basis (*Schall v. Forrest* (1977), 51 Ill. App. 3d 613, 615, 366 N.E.2d 1111), the alleged admission in this case is of little substance. We find no error in the trial court's refusal to permit its consideration by the jury.

■■ ■ Defendant testified that after the fire he went to see plaintiff's brother, James Regas, and signed a statement drafted by the latter which contained the admission that the fire could have been started only by sparks and embers coming from the oxyacetylene torch. On examination by his own counsel, defendant testified that during the conversation with Regas the latter stated, "Sir, well, we have an attorney and we have insurance; and cooperate with us and we'll take care of things at the end." It was after that conversation with Regas that he signed the statement. Later defendant again testified concerning the same statement, that Regas told him, "* * * cooperate. I had a free attorney and he had insurance; and he would take care of it then." Plaintiff contends that the double reference to insurance constituted reversible error. The law prohibits the intentional injection of insurance into a lawsuit, whether possessed by

plaintiff or defendant and should be avoided. (*Cecil v. Gibson* (1976), 37 Ill. App. 3d 710, 712, 346 N.E.2d 448, and cases therein cited.) This alleged error was not contained in plaintiff's written post-trial motion, however, and cannot be further considered, therefore, on appeal. *Tripp v. Bureau Service Co.* (1978), 62 Ill. App. 3d 998, 1004, 379 N.E.2d 324.

Plaintiff complains further with respect to certain judicial comments made during the course of the trial regarding the existence and location of holes in the flooring which were created by the removal of vertical water pipes. Plaintiff's counsel sought to elicit from his expert witness an opinion as to the length of time it would take for sparks (the objection to molten globules having already been sustained) to fall the distance of 50 to 60 feet vertically, to which objection was made by defendant. In making his ruling, the remarks of the trial judge could have had the effect of advising the jury that there was no evidence upon which the jury could base a conclusion that there were holes through which even sparks could have fallen from the fifth floor to debris situated on the first floor, nor as to where the holes were located. Although this commentary could have had an adverse effect on plaintiff's theory of the case, no objection was made by plaintiff's counsel at the time of trial and error cannot be raised therefor on appeal. (*Forest Preserve v. Wike* (1954), 3 Ill. 2d 49, 57-58, 119 N.E.2d 734; *City of Chicago v. Baird* (1971), 132 Ill. App. 2d 644, 270 N.E.2d 259, *aff'd* (1972), 52 Ill. 2d 512, 288 N.E.2d 110.) Nevertheless, upon the new trial, the court should "be conscious of the fact that he is the dominant figure in the courtroom in any jury proceeding and that his inadvertent comment on the evidence or attitude of belief or disbelief can well prejudice the jury." *Hickey v. Chicago Transit Authority* (1964), 52 Ill. App. 2d 132, 137, 201 N.E.2d 742.

Plaintiff contends that the trial court erred in excluding evidence of certain safety standards contained in chapter 76 of the Municipal Code of Chicago, applicable to the use of an oxyacetylene torch, as accepted engineering practices in the city of Chicago. The first standard, adopted from the American National Standard Institute, was A10.2-1944, section 6.1.3, as follows:

"If the objects being welded or cut cannot be moved, and if all fire hazards cannot be removed, then guards shall be used to confine the heat, sparks and slag to protect all fire hazards."

The second standard, adopted from the National Fire Protection Assoc., 51B, section 424, is worded as follows:

"Wall or floor openings or cracks within 35 feet of the site shall be tightly covered to prevent the passage of sparks to adjacent areas."

Defendant claims that the first standard, involving the necessity of providing guards, was without any factual basis in the evidence because

no fire hazards existed and, if any did, they were not in close proximity to the cutting area. As to the second standard, defendant asserts that there was no evidence clearly pinpointing the exact distance of the laundry chute or other holes on the fifth floor with the work site. Defendant's arguments, however, ignore defendant's recognition of the existence of a fire hazard by virtue of the precautions that he did take, such as wetting the wooden floor and allegedly covering the laundry chute openings leading to the debris on the first floor. As to location, Linton testified that some of the holes for vertical pipes were "right by the elevator" and that the cutting was being done at variously estimated distances including "near the elevator" and "25 feet east of the laundry chute." There was thus a sufficient evidentiary basis upon which to permit the introduction of the accepted engineering practices in order to help establish the requisite standard of care for consideration by the jury. (*Tenenbaum v. City of Chicago* (1975), 60 Ill. 2d 363, 375-76, 325 N.E.2d 607; *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 331-32, 211 N.E.2d 253; *Murphy v. Messerschmidt* (1976), 41 Ill. App. 3d 659, 355 N.E.2d 78.) The trial court erred in precluding contemplation of the foregoing standards by the jury.

Defendant's further contention, that no evidence existed demonstrating that violation of either standard could have been the proximate cause of the fire, omits consideration of the testimony of plaintiff's expert, who stated that the ejected molten material could have fallen through the unprotected holes on the fifth floor to the debris on the first floor within two seconds time and remain hot enough to ignite combustible materials on the rubbish pile. Further, on the day after the fire, defendant told plaintiff's brother that the fire "probably would be set off by acetylene sparks" or vandals. Thus, the jury could have found under the evidence sought to be presented that the molten globules proximately caused plaintiff's damage.

■■ Plaintiff claims error in the trial court's refusal to submit to the jury the following instruction, modeled upon Illinois Pattern Jury Instructions, Civil, No. 60.01 (2d ed. 1971), (hereinafter cited as IPI Civil) and numbered Plaintiff's Instruction 17:

"There was in force in the City of Chicago at the time of the occurrence in question a certain ordinance which provided that:

While using an acetylene torch to cut metal the following procedures should be followed:

1. Shields should be erected to prevent the spread of sparks.

2. All holes and cracks in the floors within 35 feet of the site be [sic] tightly sealed with sheet metal guards.

3. Adequate fire extinguishers or buckets of water should be present at all times.

4. Welding or cutting should not be done if the sprinkler system is not operating.

5. Combustible material should be removed from work areas.

If you decide that a party violated the ordinance on the occasion in question then you may consider that fact together with all the evidence in determining whether or not a party was negligent before and at the time of the occurrence."

Defendant contends that the trial court properly excluded the foregoing instruction because there was no evidentiary basis to support it, relying upon *Forney v. Calvin; Foerster v. Illinois Bell Telephone Co.* (1974), 20 Ill. App. 3d 656, 315 N.E.2d 63; and *Theesfeld v. Eilers.* The principle identified is correct; however, the requisite evidentiary basis for the instruction was present. We have already considered the evidence which could have supported standards 1, 2 and 5 set forth in the instruction, and which were alluded to in the proposed standards considered in the preceding paragraphs; that analysis need not be repeated here. With respect to standards 3 and 4, plaintiff's expert witness testified that the absence of a sprinkler system and fire extinguishers prohibited the cutting procedures from being carried on inside the building and to do so would be in violation of applicable safety practices. Defendant's expert acknowledged that sprinklers and fire extinguishers were required by those standards, although in his opinion the workability of the sprinkler system and furnishing of fire extinguishers were the owner's responsibility. It appears then that notwithstanding the absence of these safety precautions defendant proceeded with his work, a fact which the jury could have regarded as violations of the standards and constituting the proximate cause of the fire. That being so, the jury should have been instructed that defendant by undertaking his torch cutting operations in the absence of necessary safety equipment could have been guilty of negligence. With respect to whether the provision of such equipment was plaintiff's responsibility, the question of plaintiff's due care and freedom from contributory negligence was submitted to the jury in defendant's instructions 5 and 11, conforming to IPI Civil Nos. 10.03 and 20.01. The conclusion is, therefore, compelled that it was error to refuse Plaintiff's Instruction No. 17.

Plaintiff challenges other rulings made by the trial court, including its refusal to permit re-cross-examination on matters not discussed on redirect examination and permitting defendant's expert to testify to matters which may have fallen within the common knowledge of the jury. Such points involve the exercise of discretion by the trial court (*LeMaster*

*v. Chicago, Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 1022, 343 N.E.2d 65; *Grundy County National Bank v. Myre* (1975), 34 Ill. App. 3d 287, 288-89, 339 N.E.2d 348; *Werner v. Illinois Central R.R. Co.* (1941), 309 Ill. App. 292, 304, 33 N.E.2d 121), do not rise to the level of reversible error, and need not be considered in light of the disposition of this appeal.

In consideration of the foregoing, this cause must be reversed and remanded with instructions to vacate judgment for defendant and grant plaintiff a new trial on all issues.

Reversed and remanded with instructions.

DOWNING and PERLIN, JJ., concur.