GUS TSOURMAS, as Special Adm'r of the Estate of Frances Tsourmas, *et al.*, Plaintiffs-Appellants, v. K & K HEATING AND AIR CONDITIONING, INC., *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—89—1737

Opinion filed February 5, 1991.

William R. Coulson and Timothy B. Carlmark, both of Cherry & Flynn, and Beverly, Pause, Duffy & O'Malley, both of Chicago (Robert O. Duffy, Thomas J. Brophy, and Michael W. Rathsack, of counsel), for appellants.

Edward M. Rubin and Richard J. Rosenblum, both of Johnson, Cusack & Bell, Ltd., of Chicago (Thomas H. Fegan, of counsel), for appellees.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiffs Ann Yurinich (Yurinich) and Gus Tsourmas, as special administrator of the estate of Frances Tsourmas (Tsourmas), brought this action to recover for injuries which Yurinich and Tsourmas allegedly sustained to their hearts and nervous systems. The complaint alleged that a defective heating system at their workplace produced and distributed carbon monoxide, exposing plaintiffs and causing their injuries. At the close of plaintiffs' case, the trial court directed a verdict in favor of defendants. The sole question on appeal is whether the trial court erred in granting the directed verdict.

Defendant Jack Yelnick (Yelnick) was the general contractor for the construction work performed on the workplace. The parties dispute the extent of Yelnick's involvement in the heating aspect of the building. Plaintiffs contend that Yelnick was responsible for the sale and installation of the alleged defective heating system. Yelnick denies that he hired anyone to do heating work and that he did not install or take responsibility for installing a furnace.

Defendant K & K Heating and Air Conditioning, Inc. (K & K), is alleged to have been responsible for servicing and maintaining the heating system. Defendant Northern Illinois Gas Company (NiGas) is alleged to have conducted an inspection of the gas-fired equipment on the premises for leaks, including the furnace and the heating system. The heating system in question was located in the offices of Dr. William Gogan, at 7623 West 63rd Street, Summit, Illinois (the building), where Tsourmas worked for approximately 12 years and Yurinich worked for approximately 17 years.

In order to better understand how Tsourmas and Yurinich were allegedly injured, knowledge of Dr. Gogan's office and furnace area is necessary. When the building was originally constructed, it was one large room. In late 1964 and early 1965, Yelnick remodeled the building for Dr. Gogan. He divided the one large room into a series of examining rooms in a straight line along the east side of the building with a corridor running along the west side of the building. Yelnick also installed a new dropped ceiling approximately two feet below the

original plaster ceiling. This created a two-foot gap between the two ceilings, called a plenum.

As a part of Yelnick's remodeling, the original furnace was removed and replaced with a gas-forced air furnace. New duct work was also added, including a new flue pipe, which connected the new furnace to the building's chimney. Yelnick himself testified that it appeared the hole around where the flue pipe entered the chimney had never been sealed.

In theory, the new heating system was to propel heat through the new supply duct in the plenum into the new examining rooms. In reality, however, the air from the rooms did not pass freely up through the new dropped ceiling into the plenum. In fact, the rooms were so tightly constructed by Yelnick that when the doors of the rooms were closed, the translucent panels under the light fixtures were drawn upwards to release the excess air pressure. Yelnick wired these panels down, which arguably restricted the passage of air even more. According to evidence adduced, without the free flow of air from the examining rooms through the new ceiling into the plenum, the plenum drew air from the next available source: the opening around the new supply duct leading into the furnace room.

As testified to by plaintiffs' experts, Ted Sohn and Robert E. Davis, there were a number of defects in the construction and installation of the new heating system. Each of these defects was such that it caused carbon monoxide to be created and/or distributed throughout the building. Sohn stated that the release of carbon monoxide into the atmosphere of a building is the most serious danger from a gas heating system. Moreover, these defects were also identified as violative not only of the applicable standards in the heating industry for installation of gas-fired heating systems, but also of the applicable building codes in force at the time of remodeling. Yelnick, by his own admission, was not even aware of the provisions in these codes and made no effort to find out what they were. Furthermore, Yelnick had bricked up the two windows in the furnace room, which could have been potential sources of combustion air.

One of the defects identified in the testimony was the failure to seal the hole around the new flue pipe where it was inserted into the chimney. When Dr. Gogan and his full-time employees complained of symptoms consistent with carbon monoxide poisoning, Robert E. Davis was asked to examine the building and the air within it. This was in December 1980.

Davis entered the furnace room and quickly observed the gap in the flue pipe. He stated that such a hole in the chimney meant that the

products of combustion, including carbon monoxide, would be allowed to enter the building instead of going out of the chimney. In order to check his observation, Davis went up on the roof, looked down the chimney, and saw the light from the furnace room shining through the hole. He testified that the hole created a particular problem because it would draw carbon monoxide into the furnace room, instead of releasing it. It was Davis' expert opinion, as well as Sohn's, that the lack of combustion air was not only a violation of the applicable codes and standards of the industry, but that it caused the heating system to produce levels of carbon monoxide higher than normal.

As a result of his inspection, Davis did two things. First, he told Dr. Gogan that there was a dangerous amount of carbon monoxide in the air and that the doctor's office should be shut down until repairs could be made to allow for increased combustion air and to ensure the integrity of the chimney. Second, Davis went to his car to retrieve special instruments to confirm the suspicions he had after viewing the heating system. He used an infrared device to take air samples and took the samples back to his office and analyzed them. Based on his analysis, Davis concluded that there was present in the air between 1,000 and 5,000 parts-per-million of carbon monoxide and carbon dioxide combined. He stated that as of 1975, the Occupational Safety and Health Act standard for carbon monoxide was 50 parts per million. Because of the instrument he used, however, he was unable to determine specifically the specific amount of carbon monoxide alone.

Thereafter, Davis wrote Dr. Gogan a letter outlining the repairs that needed to be done to the office. Although Davis had personally told Gogan about the presence of carbon monoxide and its dangers, he did not specifically mention the words "carbon monoxide" in the letter. He stated that this was because he was concerned about Gogan's legal liability.

In addition to his knowledge of the scientific principles of a heating system, Davis testified that it is part of training as a chemical forensic analyst to be aware of the symptoms exhibited by individuals when exposed to various chemicals. Davis observed the physical appearance of Dr. Gogan and his full-time employees and noted in them the subdermal rosiness characteristic of individuals who have been exposed to carbon monoxide.

Plaintiffs also produced two medical expert witnesses, Dr. Patrick J. Scanlon, the head of cardiology at Loyola University Medical Center, and Dr. Shirley Conibear, an expert in the field of occupational medicine. Both Dr. Scanlon and Dr. Conibear diagnosed injuries to the hearts of Tsourmas and Yurinich, caused by chronic exposure to car-

bon monoxide. Both doctors characterized the injuries as serious, painful, debilitating, and in the case of Yurinich, permanent.

Dr. Conibear stated that she based her opinion upon the objective physical findings that she herself made pursuant to numerous examinations of both Tsourmas and Yurinich. As a further basis, she administered a number of physical tests in order to rule out possible alternative causes of plaintiffs' illnesses. Dr. Conibear also considered the nature and characteristics of the symptoms exhibited by Yurinich and Tsourmas in their medical histories and records. She also explained to the jury the significance to her diagnoses of the facts that these women had only their workplace as a common environment, that their conditions were episodic, and that they developed in a parallel fashion both physically and temporally. In addition, Dr. Conibear stated that she had considered Robert E. Davis' report.

Dr. Scanlon told the jury that the chances that the heart problems suffered by these women were congenital, as opposed to being caused by an external source, were less than 1 out of 100. Dr. Scanlon was also aware of the expert findings of Mr. Davis with respect to the heating defects in the building.

The jury heard testimony of Tsourmas' episodes of tachycardia, shortness of breath, chest pain, and general fatigue. Yurinich demonstrated the same symptoms. Further testimony was admitted which evidenced that Helen Paletto, the only other full-time employee of Dr. Gogan, exhibited similar symptoms. Likewise, Dr. Gogan himself experienced the same symptoms characteristic of exposure to carbon monoxide.

K & K was called in by Dr. Gogan to check and service the heating system on various occasions between April 1977 and September 1980. Despite testimony that the K & K serviceman was in the furnace room and examined areas where the defects were obvious, K & K did not report or repair the dangerous condition of the system. Similarly, NiGas was called out to the building in 1978 to check for a reported gas leak. Again, testimony showed that the NiGas serviceman entered the furnace room and inspected it. While he repaired a natural gas leak in the front of the building, the NiGas inspector failed to detect or "red-flag" the dangerous condition of the system.

After five days of evidence, the trial court directed a verdict for defendants, ruling that plaintiffs had failed to introduce evidence of carbon monoxide poisoning sufficient to permit a jury verdict in their favor. The court did so on the ground that Robert E. Davis, prior to directing Dr. Gogan to make the necessary repairs, did not quantify his findings and opinion as to the precise carbon monoxide level in the air. Thus, the

court held that there was no sufficient basis for Davis' opinion. The court then reasoned that Drs. Scanlon and Conibear relied on Davis' report, and that if none of them could determine whether toxic amounts of carbon monoxide were in the air, a jury should not be allowed to speculate as to that fact. It is from this ruling that plaintiffs appeal.

■ The standard which governs directed verdicts was enunciated in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504. As stated by the Illinois Supreme Court:

> "[V]erdicts ought to be directed *** only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick*, 37 Ill. 2d at 510.)

Thus, where there exists a substantial factual dispute, or where the assessment of a witness' credibility and the election between conflicting evidence may be decisive, a directed verdict is inappropriate. *Anderson v. General Grinding Wheel Corp.* (1979), 74 Ill. App. 3d 270, 393 N.E.2d 9.

■ It was pursuant to the *Pedrick* standard that the trial court directed a verdict for defendants. The basis for the court's ruling was that plaintiffs' expert, Robert Davis, failed to place a precise part-per-million measurement on the amount of carbon monoxide present in Dr. Gogan's office. The absence of this sole piece of evidence, however, did not merit a directed verdict.

■ It is well established that experts are given more latitude than lay witnesses in expressing opinions. While it is true that an expert opinion must not be based on "mere conjecture," an expert may draw inferences from facts which jurors are not competent to draw. (*Forney v. Calvin* (1975), 35 Ill. App. 3d 32, 340 N.E.2d 603.) These principles were brought into focus in *Regas v. Linton* (1979), 72 Ill. App. 3d 7, 390 N.E.2d 9.

In *Regas*, this court reversed a jury verdict for the defendants, after considering the issue of whether the trial court had properly excluded testimony of the plaintiff's expert. This court held that the trial court should have permitted the expert to testify notwithstanding the fact that the expert had no personal knowledge of the existence of a substance at issue and the further fact that no one had testified to personal knowledge of its existence. Citing *Forney*, the court explained that in light of the expert's knowledge, he should not be precluded from inferring from facts in evidence, other facts which his expertise assures him exist. Similarly, in the instant case, the jury should have been allowed to consider Davis' testimony. He was clearly knowledge-

able, as evidenced by his professional qualifications. Furthermore, he personally observed the building and staff. Thus, there is even more basis for reversal here than in *Regas*.

While a precise measurement would have lent more weight to Davis' opinion, the absence of such quantification did not mean that his opinion was without sufficient basis. Davis' extensive professional training as well as his careful examination of the premises warranted the admission of his opinions regarding the cause and presence of carbon monoxide. The presence or absence of quantification should not have determined whether the case was to be submitted to the jury.

■ It is the function of the trier of fact to draw reasonable inferences and conclusions from competent evidence, direct and circumstantial. (*Beloit Foundry v. Industrial Comm'n* (1976), 62 Ill. 2d 535, 343 N.E.2d 504.) In *Beloit*, the court held that expert medical testimony as to cause of death based on a probability was properly a matter for the trier of fact's consideration. This was so even though there was no direct testimony as to cause of death.

■ In the instant case, the doctors' opinions were based on more than probabilities. Both testified as to the precise cause of plaintiffs' injuries, based on their medical expertise, knowledge of the patients' histories, and physical examinations of them. Evidence was also adduced that the coincidence of both plaintiffs' conditions being congenital was extremely small. This was not, as defendants suggest, "naked opinion."

■ Subsequent to oral argument, Yelnick filed an additional pleading with this court seeking to supplement its argument on two points. First, Yelnick denies involvement in the installation of a furnace. It is undisputed that Yelnick was the general contractor for the construction work performed on the building. Whether or not he sold or installed the furnace personally, there was direct evidence that he wired down the ceiling panels and bricked up the window, contributing to the lack of air. Indeed, this was established by Yelnick's own testimony. Once a duty has been established, it is the jury's responsibility to decide whether that duty was breached. *Ferentchak v. Village of Frankfort* (1985), 105 Ill. 2d 474, 475 N.E.2d 822.

■ Second, Yelnick argues that the relevant statutes of repose bar the instant suit. This argument is without merit. The 12-year statute of repose for strict liability contained in section 13—213 of the Code of Civil Procedure is inapplicable. (Ill. Rev. Stat. 1989, ch. 110, par. 13—213.) It applies only to causes of action in which the injury occurred on or after January 1, 1979, regardless of when the product entered the stream of commerce. In the instant case, there was evidence that the

full-time staff experienced symptoms of carbon monoxide poisoning prior to January 1, 1979, even though the defect was not discovered and repaired until late 1980. Thus, it is reasonable to infer that the injury occurred prior to January 1, 1979. Strict liability counts in which the injury occurred before January 1, 1979, remain governed by the provisions governing negligence actions. The "discovery rule" therefore applies, and suit had to be filed within two years of the date the cause of action was discovered. (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305.) The cause was discovered in late 1980, this suit was filed on April 12, 1982, and therefore, the 12-year statute of repose does not operate to bar the strict liability count.

■ Similarly, the 10-year negligence statute of repose contained in section 13—214(b) of the Code of Civil Procedure does not apply. (Ill. Rev. Stat. 1989, ch. 110, par. 13—214(b).) This section was also enacted in 1979. Again, although we can infer from the evidence that the injury occurred prior to January 1, 1979, the defective nature of the furnace was not discovered until November 1980. Statutes of limitations are generally given prospective effect and not retroactive effect unless a legislative intent to the contrary is clearly manifested. (*Costello v. Unarco Industries, Inc.* (1986), 111 Ill. 2d 476, 490 N.E.2d 675; *Herrerra v. Lester Engineering Co.* (1983), 116 Ill. App. 3d 228, 452 N.E.2d 68.) *Erdie v. Central Illinois Public Service Co.* (1988), 175 Ill. App. 3d 1050, 530 N.E.2d 514, cited by Yelnick, has no bearing on this conclusion. In *Erdie*, the injuries occurred after the statute was enacted. In the instant case, they occurred before the enactment of the statute.

■ Viewing all of the evidence in the light most favorable to plaintiffs, it cannot be said that the jury could not have found for them. Even without a precise measurement from Davis, there was sufficient evidence to create a factual dispute. The trial court should not have deprived the jury of the opportunity to perform its rightful function. Since the court erred in directing a verdict for defendants, the cause must be remanded for a new trial.

Reversed and remanded.

SCARIANO, P.J., and HARTMAN, J., concur.