SHIRLEY GRABNER, Indiv. and as Adm'x of the Estate of Robert Grabner, Deceased, Plaintiff-Appellant, *v.* AMERICAN AIRLINES, INC., Defendant and Third-Party Plaintiff-Appellee.—(ITT GRINNELL CORPORATION, Third-Party Defendant-Appellant.)

First District (3rd Division)   Nos. 77-1353, 77-1621 cons.

Opinion filed February 27, 1980.

William D. Maddux, of Chicago (Thomas H. Fegan, of counsel), for appellant Shirley Grabner.

Menk & Bishop, of Chicago (John Cadwalader Menk, Ronald T. Bishop, and John T. Mehigan, of counsel), for appellant ITT Grinnell Corporation.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Thomas F. Tobin, and J. Patrick Herald, of counsel), for appellee.

Mr. JUSTICE SIMON delivered the opinion of the court:

Robert Grabner, a plumber, died when a pressurized water pipe that he was repairing broke and he was trapped in a flooded underground room. His widow sued the city of Chicago, the owner, and American Airlines, the lessee of the land on which the pipe was located. The city was dismissed from the suit, and American sued ITT Grinnell, the manufacturer of the pipe, in a third-party action. The jury returned a verdict for American without addressing the suit against ITT Grinnell. Mrs. Grabner now appeals, claiming that four errors below deprived her of a fair trial.

To understand the importance of the claimed errors, it is necessary to discuss in some detail the facts of the case, although the plaintiff does not allege that the jury's verdict in favor of American was against the manifest weight of the evidence. The pipe around which the trial revolved was part of an emergency sprinkler system for American's aircraft hangar at Chicago's O'Hare Field. The system featured an underground reservoir, a battery of automatic pumps, both diesel and electric, and piping which ran from the pumps to the nozzles in the hangar. The system was kept

pressurized at 160 pounds per square inch (p.s.i.) by a jockey pump that switched on whenever the pressure in the system dropped. If the jockey pump could not return the pressure to 160 p.s.i. by itself, then the main pumps came on to deliver the full water pressure to the hangar.

Sometime in 1971, American discovered by looking at the records for the jockey pump that it was switching on more than usual. After some exploration, American found a leak in the 16-inch underground pipe leading from the pumphouse. The leak was excavated, and a plumbing company was called in to do the repair. The plumbing company sent Gene Bruning, one of its supervisors, and Robert Grabner and Kenneth Kiesgan, two of its foremen, to perform the actual repair on the morning of February 25, 1972.

The plumbers were to work on the leak in a trench dug next to the pumphouse's foundation. The 16-inch pipe entered the pumphouse some 5 feet below the ground, going through the foundation wall into the pumphouse's subbasement. Inside, the pipe made a 90° turn up in an elbow that narrowed the pipe's width to 12 inches. The 12-inch pipe continued up toward the subbasement ceiling until it was 6 to 8 feet above the floor, then made a 90° turn in another elbow to continue parallel to the ceiling. This pipe was suspended from the ceiling by brackets.

To rearrange the pipe in the trench so they could fix the leak, Grabner and Kiesgan disconnected a section of the pipe inside the pumphouse by unbolting the upper elbow from the ceiling pipe. In fixing the broken connection on the 16-inch pipe, the plumbers drove that pipe deeper into its bell socket. The result was that the vertical section of pipe inside the pumphouse moved about an inch closer to the pumphouse wall. Once the outside pipe was repaired, Grabner and Kiesgan tried to reconnect the upper elbow inside the pumphouse, but here they ran into trouble. When the connection between the elbow and the ceiling pipe was made, it began to leak under only 50 p.s.i. of pressure. Charles Manchester, an American supervisor who watched the repairs, said that the placement of the elbow did not match that of the ceiling pipe. In plumber's terms, the two were neither plumb—together face to face—nor flush—flat on one another. The vertical section of the pipe to which the upper elbow was connected was not positioned straight up and down, but was pitched to one side. The plumbers decided that a spacer, a one-inch section of pipe to fill the gap, was needed. However, the only suitable piece of equipment they had with them had to be machined before it would fit. The piece was sent to a machine shop that American recommended, and work could not resume until it was returned later that evening.

American was anxious to have the job finished, since although the section of the emergency sprinkler system which was being repaired had been isolated, the entire system could not be in complete readiness until

the plumbers finished and the repaired section was put back on line. Grabner and Kiesgan likewise wanted to finish, because they had been on the job since 8:30 that morning.

But even when the spacer was installed the problems did not end. The plumbers bolted the elbow to the ceiling pipe with the spacer between the two and the system was repressurized, but again it leaked. The pumps were again turned off and the pipes drained to cut off all pressure. Grabner and Kiesgan used a "persuader" to further tighten the connecting bolts. When the system was repressurized, there did not seem to be any more leaks. An American employee put the repaired section back on line, and the plumbers put their tools in their truck.

Before Grabner and Kiesgan could leave, however, a "tear drop leak" was discovered at the spacer. It was now 11 p.m. The jockey pump was turned off, but the pressure built up in the system was not relieved by draining the water, a task that had taken 30 minutes each time it was done before. With pressure still in the pipes, Kiesgan and Grabner tried to tighten the bolts connecting the elbow and the ceiling pipe once more to eliminate the leak. Grabner stood on a stay holding the vertical section of pipe in position, while Kiesgan stood on the floor. They tightened each bolt in turn, one holding a wrench on one side of the bolt and the other turning a wrench on the other side. As they were working the elbow cracked. Water gushed out of the crack and quickly filled the subbasement. Kiesgan, Bruning and two American employees in the room escaped to safety up a steep steel ladder. Grabner's body was not found until the room was pumped dry. He had drowned.

The relative position of the elbow and the ceiling pipe as the plumbers fastened them together became an important issue at trial. American and ITT Grinnell each presented an expert witness who tried to explain why the elbow had cracked. Each testified that cast iron, of which the elbow was made, is a very brittle substance that will bend only a small amount before cracking. A force of 20,000 p.s.i. would crack the pipe and, working with "persuaders," it was possible that Grabner and Kiesgan could have applied that much force to the elbow if the pipes were misaligned.

■■ Plaintiff now complains that in answering a hypothetical question, ITT Grinnell's expert assumed two facts not in evidence: that the elbow and ceiling pipe did not come together evenly after the spacer was installed, and that at one point the pipes were separated by a gap of one-quarter inch. Expert witnesses are allowed to give their opinions on scientific matters beyond the ordinary person's knowledge to assist the finders of fact. (*Hernandez v. Power Construction Co.* (1978), 73 Ill. 2d 90, 99, 382 N.E.2d 1201, 1205; *Kassela v. Stonitsch* (1978), 57 Ill. App. 3d 817, 823, 373 N.E.2d 608, 613; *Chloupek v. Jordan* (1977), 49 Ill. App. 3d

809, 814, 364 N.E.2d 650, 654.) They may answer hypothetical questions, but to keep their opinions from being mere conjecture, the hypothetical must be based on facts in evidence. (*Hahn v. Eastern Illinois Office Equipment Co.* (1976), 42 Ill. App. 3d 29, 33, 355 N.E.2d 336, 340.) It is up to the court to determine if an assumed fact in a hypothetical question has a basis in the evidence. *Abramson v. Levinson* (1969), 112 Ill. App. 2d 42, 49-50, 250 N.E.2d 796, 800-01.

■■ ITT Grinnell's expert could assume that the pipes did not come together evenly, since Manchester had testified that they were neither plumb nor flush and that the vertical pipe below the elbow was pitched to one side. He could also assume that the elbow and ceiling pipe were closer together at the bottom than at the top when they were connected. The expert deduced this fact from the manner in which the elbow cracked as disclosed by his physical examination. The assumptions in a hypothetical are proper so long as they are within the realm of direct or circumstantial evidence, or are reasonable inferences from the established facts. (*Guardian Electric Manufacturing Co. v. Industrial Com.* (1973), 53 Ill. 2d 530, 535, 293 N.E.2d 590, 594.) Even if there was no evidence to support an assumption that the pipes were in this particular configuration, there was no prejudice to the plaintiff. ITT Grinnell's expert was asked on cross-examination if his answer to the hypothetical would change if the pipes were in different configurations, such as parallel though separated or closer together at the top than at the bottom. Thus, the jury's attention was focused on the position of the pipes and the expert's differing conclusions for each configuration. This is the best way for opposing counsel to deal with a hypothetical whose assumptions are drawn from disputed or controverted evidence. See *Holmes & Brothers, Inc. v. Industrial Com.* (1945), 391 Ill. 277, 279, 63 N.E.2d 505, 506.

ITT Grinnell's expert could not assume, however, that the gap separating the elbow from the ceiling pipe after the spacer was installed was one-quarter inch. That fact was not in evidence and could not be reasonably inferred. But even though this assumption was put to the expert in the hypothetical questions, the expert explicitly stated in his long answer that he did not know exactly how much the pipes were cocked. Thus, the jury was apprised by the expert himself that the size of the gap did not play a role in arriving at his answer to the hypothetical. There was no prejudice to the plaintiff from including the fact not in evidence in the hypothetical question.

The plaintiff also complains that she was not allowed to impeach Manchester while examining him as an adverse witness. Manchester testified at trial that he twice asked Bruning if he wanted the system shut down and depressurized before the final tightening of the pipe connection. According to Manchester's testimony, Bruning replied the

second time that it would not be necessary, that they did that type of work under pressure all the time. In Manchester's deposition, he had recalled the first conversation with Bruning, but could not remember the second. The jury heard about Manchester's improved memory at trial, but an objection to the use of the deposition as a prior inconsistent statement was sustained.

■ Plaintiff argues that she was denied her right to impeach Manchester. The test of whether a prior inconsistent statement is sufficiently inconsistent to be used for impeachment was stated in *People v. Rainford* (1965), 58 Ill. App. 2d 312, 320-21, 208 N.E.2d 314, 318-19:

> "Generally, a prior statement of a witness, in order to be capable of being proved for purposes of impeachment, must be materially inconsistent with his testimony. The test to be applied in determining inconsistency * * * is that the inconsistent statement must have a reasonable tendency to discredit the direct testimony on a material matter. McCormick on Evidence, c 5, § 34, p 64 (1954)."

A witness is not to be discredited by a variance in slight particulars between the testimony and his previous statements where there is no material inconsistency or contradiction (*People v. Boyd* (1974), 22 Ill. App. 3d 1010, 1024, 318 N.E.2d 212, 222), and the inconsistencies must be great enough to deny (*Spiotta v. Hamilton* (1970), 120 Ill. App. 2d 387, 394, 256 N.E.2d 649, 652) or contravene the material matter (*Goldstein v. Hertz Corp.* (1973), 16 Ill. App. 3d 89, 97, 305 N.E.2d 617, 624).

■ The deposition was not inconsistent, for inability to remember a fact prior to trial is not inconsistent with later recall at trial. The scope of cross-examination is within the sound discretion of the trial judge, and the exclusion of the deposition was proper where the jury was allowed in any event to know that the witness' memory improved at trial.

■■ One of the theories on which plaintiff's case was predicated was that American violated the Structural Work Act (Ill. Rev. Stat. 1977, ch. 48, par. 60 *et seq.*). Plaintiff alleges that the refusal of her instruction describing the Structural Work Act issues raised by the pleadings was error. Illinois Pattern Jury Instructions, Civil, No. 180.08 (hereinafter IPI Civil) summarizes the issues made by the pleadings in a Structural Work Act case. The trial court is to set forth within the instruction, in the court's own words, the allegations of the complaint and the answer, without undue emphasis or repetition. Plaintiff's tendered version of IPI Civil No. 180.08 was properly refused. It contained three alternative allegations of ways in which American had violated the Act, none of which comported with the amended complaint as it stood in its final version. The version of IPI Civil No. 180.08 that was given to the jury did not refer to the final wording of the complaint, that American violated the Act by providing a

support "which was defective and not proper and adequate" for the safety of Robert Grabner. This was not error. IPI Civil No. 180.13 recommends that no instruction be given to define the statutory terms "proper and adequate." By omitting the term "defective" from the summary of plaintiff's complaint the trial court was following the IPI admonition to summarize the complaint without undue emphasis. The jury was left to decide what was proper and adequate according to the common sense meaning of the term, as IPI suggests. See *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 323, 211 N.E.2d 247, 252.

■■ Plaintiff also complains that IPI Civil No. 180.17 which states that contributory negligence is not a defense once a violation of the Act is proven, was not given. Plaintiff did not tender the instruction at trial, so should not be heard to complain on appeal. (Ill. Rev. Stat. 1977, ch. 110A, par. 366(b)(2)(i).) In addition, the proper IPI instruction on proximate cause was given. The decision to leave the pipes pressurized was not an example of contributory negligence. The death here came about not because of a failure or inadequacy of any structure or support, but instead because there was water left in the pipes that gushed out when the elbow cracked. Even if there was a violation of the Act in this case, the plaintiff could not have recovered, for the violation would not have been the proximate cause of the death.

Plaintiff finally contends that the verdict was the product of the passion and prejudice of the jury induced by the conduct of the attorneys for American and ITT Grinnell. The trial was vigorously prosecuted by all parties. The conduct of plaintiff's counsel was itself the subject of objection at trial. The trial court several times warned the attorneys to curb their reactions and rhetoric, and there was substantial compliance with the order.

■■■ Plaintiff has four specific complaints. First, she objects to 21 motions for mistrial made by American and ITT Grinnell, 12 of which were made in the jury's presence. Motions for mistrial are a common and useful way of preserving a purported error for appeal. The routine motion for mistrial is not a ground for reversal. Second, plaintiff alleges that her counsel was the subject of personal attacks. Plaintiff's counsel told the jury that tempers had occasionally flared and asked that it not hold the conduct of counsel against the parties. Even if there had been personal attacks, this request defused any prejudicial impact on the jury. Third, plaintiff complains that counsel for American misstated the law in closing argument and commented on rulings of the trial court. No objection was raised at the time of the comments, and so the issue is waived on appeal. Fourth, American's counsel referred in closing argument to a fact not in evidence. No objection was made at trial and so this, too, is

waived. The trial judge, who witnessed the attorneys' conduct first-hand, commented at trial that the conduct of all the attorneys was tainted. Plaintiff should not receive a new trial on this ground. The judgment is affirmed.

Judgment affirmed.

McGILLICUDDY, P. J., and McNAMARA, J., concur.