WAYNE NELSON, Plaintiff-Appellant, *v.* SPEED FASTENER, INC., *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 80-2016

Opinion filed July 28, 1981.—Modified on denial of rehearing December 1, 1981.

540

John S. Adler, of John D. Hayes and Associates, Ltd., of Chicago, for appellant.

David Acker, of Winston & Strawn, of Chicago, for appellee Speed Fastener, Inc.

Sweeney & Riman, Ltd., of Chicago, for appellee Brosius Bros., Inc.

Francis Higgins, of Bell, Boyd, Lloyd, Haddad & Burns, of Chicago, for appellee Underwriters Laboratories, Inc.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Plaintiff Wayne Nelson brought an action to recover damages resulting from a construction accident. Plaintiff was injured when some small metal particles entered his left eye, leading to an eventual loss of vision in that eye. Plaintiff asserts that his injury was caused by a defectively designed tool. The tool in question is a Speed Fastener Model 825 powder actuated stud driver, commonly called a stud gun. The tool was designed and marketed by Speed Fastener, Inc., and manufactured by Brosius Brothers, Inc. Speed Fastener and Brosius were joined as defendants under the theory of strict liability in tort. Underwriters Laboratories, Inc., which had tested and approved the Model 825, was joined in a negligence count.

The cause went to trial and the jury heard testimony from 13 witnesses for the plaintiff. At this juncture, defendants filed a joint motion *in limine* to exclude the testimony of Ralph Barnett, plaintiff's expert witness. The trial court found plaintiff's evidence insufficient to support an expert opinion that a defect in the stud gun proximately caused plaintiff's injuries, and on this basis the court granted the motion to exclude plaintiff's expert witness. All three defendants then moved for directed verdicts, which the trial court granted. Plaintiff appeals.

The principal issue on appeal is the propriety of the trial court's exclusion of plaintiff's expert witness. Since the trial court based its ruling on the lack of factual support for the expert's conclusions, the facts as elicited from plaintiff's witnesses must be reviewed in some detail.

Plaintiff was a carpenter employed by Dewitt Clinton Bend, a construction contractor in Sterling, Illinois. Bend was involved in the construction of an addition to the Faith Baptist Church in Sterling. On April 18, 1973, the date of the occurrence, Bend's crew was engaged in the erection of exterior walls and interior partitions on a concrete slab floor. The addition to the church was a prefabricated building, so the principal tasks of the construction crew at this time were the unloading of numbered wall segments and the fastening of these wall segments to each other and to the concrete floor.

Prior to erecting the wall segments, the workers snapped chalk lines on the floor to fix the location of the exterior walls and interior partitions. The workers then fastened steel plates to the concrete floor. These plates, which the men called "angle iron," were heavy sheet metal pieces approximately 48 inches long, 3½ inches wide on the horizontal surface (the side fastened to the floor), and 1½ inches high on the vertical surface. The plates were 16-gauge steel (approximately 1/16-inch thick) and had holes drilled on the vertical surface. The plates were fixed to the floor, end to end, and the wall segments were then lowered by a crane to rest on the plates. The workmen next attached the wall segments to the plates by driving nails through the predrilled holes and into the wood framing of the wall segments. When the walls have been plumbed and fastened at the top, the roof can be laid and the building is complete.

Bend's crew used a stud gun to fasten the steel plates to the concrete floor. This tool is called a "powder actuated stud driver" because it uses the force of an exploding powder charge to drive a fastener (the stud) into concrete or metal surfaces. The tool resembles a large pistol, with a pistol-type grip and trigger and a large, thick barrel. At the end of the barrel is a saucer-shaped guard assembly. In order to operate the tool, the barrel is opened, a powder load is inserted, and a fastener is placed in the barrel. The fastener can be a high-strength nail or a stud with a threaded shaft. The tool cannot be fired unless the guard at the end of the barrel is pressed against the work surface. In this configuration, the guard acts to contain any flying debris that might result from the fastener's being impelled into the work surface. This feature also prevents the tool from being used as a weapon.

The design of the tool, however, does not require that the guard be absolutely flush or that the work surface be perfectly flat. While the tool must be pressed against the work surface with several pounds' pressure, the tool may be fired while tilted a few degrees from the perpendicular.

This aspect of the tool's design enables the tool to be used on uneven surfaces. When the tool is fired from a tilted position, the guard is no longer flush with the work surface, so some debris may be emitted. The amount of allowable tilt depends on the position of the guard. In its fully opened position, the guard is roughly circular in shape and is approximately 4½ inches in diameter. By loosening a thumbscrew, the shape of the guard can be altered. In its fully closed position, the guard is a rectangle 3½ inches by 4 inches. The closed position allows studs to be driven in close proximity (1 inch) to a wall or other obstruction. With the guard in the fully opened position, the maximum angle of fire (the angle by which the tool may deviate from the perpendicular and still be fired) is 5°. At this angle, the gap between the guard and the work surface is one-quarter inch. With the guard in the fully closed position, the maximum angle of fire is approximately 11°, and the gap between the guard and the work surface is nearly three-quarters of an inch.

The angle of fire and the gap between the guard and the work surface are of vital concern to plaintiff, since he maintains that he was struck in the eye by flying metal chips that escaped from beneath the guard of the stud gun. At the time of his injury, plaintiff was kneeling on the floor, snapping a chalk line. A co-worker, Leo Coble, was holding the other end of the chalk line. A third man, John McGava, was using a Speed Fastener stud driver to fasten the angle iron plates to the concrete floor. No other workmen were in the vicinity. At one point, while McGava was between 8 and 20 feet from plaintiff, plaintiff felt something enter his left eye. The injury occurred simultaneously with a loud noise, similar to the sound of a stud gun. Plaintiff did not immediately tell his co-workers of the injury, but instead went to a washroom to wash his eye. Later that day, his co-workers noticed the bloodshot condition of his eye, and suggested that plaintiff see a doctor. Plaintiff completed the day's work and made an appointment to see a doctor the next day. It was not until a few days after the accident that plaintiff concluded that there was a connection between the operation of the stud driver and the injury to his eye.

Several minute metal chips were removed from plaintiff's eye. The largest particle was approximately 1 millimeter long. A metallurgical analysis of these chips indicated that they in all likelihood had come from the metal plates that were being fastened to the floor. Plaintiff contends that the stud gun, which was shooting hardened metal fasteners through the metal plates into the concrete floor, allowed high-velocity debris to escape from beneath the guard and penetrate his eye. Plaintiff's expert witness, had he been allowed to testify, would have concluded that the stud gun was defectively designed and unreasonably dangerous because, with the guard in the closed position, the tool could be fired 10° to 12° from the perpendicular, and this angle produced an unacceptably large

gap of nearly three-quarters of an inch between one side of the guard and the work surface. Plaintiff's expert witness acknowledged that, with the guard in the open position, the angle of fire and the gap are much smaller (5° and one-quarter inch, respectively), and the tool is not unsafe when so used. While it is still possible for debris to escape through the one-quarter inch gap, plaintiff's expert found this to be an acceptable risk, since it is desirable that the tool be able to operate on an uneven work surface.

Defendants argue that plaintiff's expert witness was properly excluded because his opinion that the tool is unsafe was based on facts not in evidence. Specifically, defendants point out that, according to the expert's opinion, the tool is only unreasonably dangerous when it is operated at a tilt exceeding 5°, and the tool will not operate at such an angle unless the guard is in the closed position. Since no witness testified that the tool was being fired at an angle or that the guard was in the closed position, defendants maintain that an expert opinion that the tool is dangerous under these conditions is incompetent.

■■■ There was little testimony as to the actual operation of the stud gun on the day of plaintiff's injury. The evidence established that DeWitt Bend had completed nearly all of the stud driving on that day. When asked at trial what position the guard was in, Bend testified, "I think it was down here this way." Defense counsel noted for the record that Bend was referring to the "rectangular position" of the guard; this is the closed position. Bend was later impeached on that point, as he had stated at a deposition that he could not remember the position of the guard. John McGava testified that, while Bend was attending to another matter, McGava "took the stud gun and whacked a couple plates in for him." If Bend's trial testimony is believed, the jury could have inferred that Bend operated the tool with the guard in the closed position and McGava did not alter that configuration when he took the tool to "whack a couple plates." Both men testified that they operated the tool in the perpendicular position with the guard flush against the plates and did not see any debris emitted.

The trial court relied in large part on the case of *Forney v. Calvin* (1975), 35 Ill. App. 3d 32, 340 N.E.2d 603. The *Forney* case recites the accepted rules concerning lay and expert testimony. Lay witnesses can only testify to facts within their personal knowledge; expert witnesses, on the other hand, are allowed to draw conclusions from the facts, provided that the jury is incompetent to draw such conclusions, and only if the expert's opinion is based on facts adduced at trial. The expert's conclusions may not be based on "mere conjecture." (See *Forney v. Calvin* (1975), 35 Ill. App. 3d 32, 38.)

Plaintiff contends that his expert witness' opinion was based on more than conjecture. It is undisputed that plaintiff's eye was penetrated by

metal fragments, and it is highly probable that these fragments came from the steel plates being installed with the stud gun. Plaintiff was in the vicinity of the stud gun and no workman, other than the stud gun operator, was working with the steel plates. On the basis of these facts, the jury could have inferred that the fragments which entered plaintiff's eye were debris caused by the firing of the stud gun. This inference, however, only provides an explanation for plaintiff's injury. Defendant's liability must be based on an injury *and* the finding that a defective condition- of the stud gun proximately caused that injury. (See *Barr v. Rivinius, Inc.* (1978), 58 Ill. App. 3d 121, 127, 373 N.E.2d 1063.) The alleged defect in the stud gun is that it will fire when the gap between the guard and the work surface exceeds one-quarter inch. According to plaintiff's expert, the tool's ability to fire with a gap of less than one-quarter inch is not a defect. If plaintiff is to prove that the defective condition of the stud gun caused his injury, he must show that it was the tool's ability to fire with a wide gap (exceeding one-quarter inch) that caused his injury. The trial court correctly concluded that plaintiff's expert witness had no basis for giving an opinion regarding the issue of causation: the expert had no way of knowing how the tool was being used or how the injury occurred.

The jury, however, need not have relied on expert testimony to form an opinion on proximate cause. The more significant subject for expert opinion is whether the tool is unreasonably dangerous. Plaintiff's expert could have testified that the tool is unreasonably dangerous under certain conditions (*i.e.*, operated at an angle with the guard in the closed position), and it is the function of the jury to decide whether those conditions obtained, whether the tool was in fact unreasonably dangerous, and whether the alleged dangerous condition proximately caused plaintiff's injury. (See *Anderson v. Hyster Co.* (1977), 56 Ill. App. 3d 41, 50, 371 N.E.2d 279, *aff'd* (1979), 74 Ill. 2d 364, 385 N.E.2d 690.) "[T]he issue of proximate cause 'is pre-eminently one for the jury ° ° °.' " *Stanfield v. Medalist Industries, Inc.* (1975), 34 Ill. App. 3d 635, 641, 340 N.E.2d 276, quoting *Wells v. Webb Machinery Co.* (1974), 20 Ill. App. 3d 545, 553, 315 N.E.2d 301, 309.

■■■ The fundamental requirement with respect to expert testimony is that the assumptions that support the expert's opinion must be within the realm of direct or circumstantial evidence, supported by the facts or reasonable inference from the facts. (See *Guardian Electric Manufacturing Co. v. Industrial Com.* (1973), 53 Ill. 2d 530, 535, 293 N.E.2d 590.) Defendants contend that, in the instant case, this requirement is not met because the men who operated the stud gun testified that they fired the gun with the guard flush against the steel plates and saw no debris emitted. Defendants argue that, on these facts, there was no basis in the

evidence to conclude that the tool was dangerous or defectively designed. Nevertheless, the fact that metal chips penetrated plaintiff's eye belies the observations of the stud gun operators, and the jury could reasonably have inferred that, on at least one occasion, John McGava operated the tool while the guard was not flush. Generally, it is the function of the trial court to decide if the facts assumed in expert testimony have a basis in the evidence. (*Grabner v. American Airlines, Inc.* (1980), 81 Ill. App. 3d 894, 898, 401 N.E.2d 1196.) Here, however, we find that the trial court took a needlessly restrictive view of what facts were in evidence. The better course would have been to admit the testimony of plaintiff's expert witness and allow extensive cross-examination with respect to the disputed and unclear facts. (See *Grabner v. American Airlines, Inc.*(1980), 81 Ill. App. 3d 894, 898; see also *Sanchez v. Black Bros.* (1981), 98 Ill. App. 3d 264, 271, 423 N.E.2d 1309, (finding, in a case involving the same expert witness as the instant case, that the expert is usually a hired partisan, so cross-examination should be given the widest possible latitude).) The defense attorneys could certainly have elicited plaintiff's expert's views that a one-quarter-inch gap between the guard and the work surface presents an acceptable risk, and that the tool is not dangerous when used with the guard in the open position. Furthermore, even though it would have been proper to exclude the expert's opinion as to probable cause, we believe that the trial court erred in wholly excluding the witness' testimony. The expert had personally examined the stud gun involved in the accident. He could therefore have testified concerning the tool's characteristics on the basis of his personal knowledge. We conclude, then, that the trial court erred in granting the motion *in limine*. It is undisputed that the exclusion of the expert's testimony seriously prejudiced plaintiff's case, so the cause must therefore be remanded for a new trial.

The judgment of the trial court is reversed and the cause is remanded for a new trial.

Reversed and remanded.

DOWNING and PERLIN, JJ., concur.