RUTH ANN MYERS *et al.*, Plaintiffs-Appellants, v. L. E. WILLIAMS, Defendant-Appellee.

Fifth District   No. 5—86—0206

Opinion filed September 24, 1987.

---

*Justice Lewis replaces Justice Jones, who retired after the cause was taken under advisement.

Hoagland, Maucker, Bernard & Almeter, of Alton (Stephen J. Maassen, of counsel), for appellants.

John P. Ewart and Paul R. Lynch, both of Craig and Craig, of Mattoon, for appellee.

JUSTICE KASSERMAN delivered the opinion of the court:

The circuit court of Marion County entered judgment upon a jury verdict in favor of defendant, Dr. L. E. Williams, and against plaintiffs, Ruth Ann and Larry Ray Myers, on plaintiffs' malpractice claim. Plaintiffs have perfected the instant appeal. The facts are as follows.

On August 24, 1983, at approximately 11 a.m., plaintiff Ruth Ann Myers, a cleaning lady, "felt something pull in [her] back" when she picked up the end of a couch while cleaning a client's house. She finished the cleaning job, went home, did her own housework and prepared dinner for her husband and herself. Since her back was still bothering her, Mrs. Myers called defendant, a chiropractor, at approximately 5 p.m. for an appointment. Mrs. Myers and her daughter went to defendant's office shortly thereafter. Mrs. Myers testified that she had no difficulties with either leg at that time.

Between 5 p.m. and 6 p.m., Mrs. Myers arrived at defendant's office. After completing a form and having X rays taken of her spine, she was ushered into the treatment room, where defendant instructed her to lie face down on a padded table. Mrs. Myers testified that

defendant performed "some kind of adjustments" while she was lying face down and that she felt intense pain radiating from her back down into her legs when she tried to roll over onto her side. Mrs. Myers testified that after defendant helped her to her side, he performed "some kind of adjustments" upon her back and her legs and that she continued to experience the same kind of pain. After defendant was finished, he helped Mrs. Myers off the table and guided her to her car; defendant walked backwards facing Mrs. Myers, his arms and hers locked together. She made an appointment with defendant for 8 o'clock the following morning.

Mrs. Myers testified that when she got home she needed assistance walking to the back steps. At the back steps she could not lift her legs, so her husband carried her up the steps, into the house and laid her down on a sofa where she spent the night. Although Mrs. Myers was able to change her clothing the following morning, she could not take a bath.

On August 25, 1983, Mrs. Myers, with the aid of crutches, walked from her car to defendant's treatment room for her appointment. After defendant helped place her on the examining table, Mrs. Myers testified that defendant "[put] his hands on my back" and that the pressure he exerted while doing so caused pain so intense that defendant had to stop. Defendant then rubbed something on Mrs. Myers' back and helped her off the table. Mrs. Myers thereafter left defendant's office on crutches with assistance from her son. Mrs. Myers made an appointment with defendant for the following day.

Mrs. Myers testified that when she arrived at her home, she walked with crutches from the car to the sofa, with assistance from her son in getting up the back steps. With the exception of going to the restroom, she stayed on the sofa until the following day. Mrs. Myers testified that during this time she felt excruciating pain emanating from her lower back into both legs, especially the left leg.

On August 26, 1983, Mrs. Myers, once again with the aid of crutches, walked from her car to the defendant's treatment room for her appointment. Mrs. Myers testified that after defendant helped her onto the examining table, he showed her a tool which he was going to use to exert pressure upon her back. During this treatment, Mrs. Myers continued experiencing the same pain. This was the last treatment Mrs. Myers received from the defendant.

Mrs. Myers testified that after this treatment she went home and lay on the sofa, where she remained for approximately 12 days. After this period, her condition improved and she was able to resume her occupation. However, she continued to feel pain radiating from her

back into her lower legs. While cleaning a house on April 13, 1984, Mrs. Myers once again experienced intense back and leg pain. After driving home she called her husband, who took her to the emergency room at St. Mary's Hospital in Centralia, Illinois. Mrs. Myers testified that the emergency room physician took X rays and performed a CT scan, then gave her injections and a prescription for Demerol. This physician told Mrs. Myers that she should obtain further medical treatment from a specialist.

On April 17, 1984, Mrs. Myers was examined by Dr. John Kenney, an orthopedic surgeon. Dr. Kenney obtained a history, conducted a physical examination, and reviewed X rays, a lumbar myleogram and a CT scan and concluded that Mrs. Myers had an acute herniated disc at the L5-S1 level. On April 23, 1984, Dr. Kenney performed surgery on Mrs. Myers' lower back and removed a large herniated disc at the L5-S1 level. Dr. Kenney testified during an evidence deposition that the herniated disc could have caused the back pain Mrs. Myers suffered.

Defendant could not independently recall his examination and treatment of Mrs. Myers. Relying upon the notes he made while examining and treating Mrs. Myers, defendant testified as follows as to how he probably treated her.

When Mrs. Myers arrived for her first visit, defendant took three X rays of her lumbar spine and pelvis. Although defendant found no fractures, dislocations, or bone disease processes in these X rays, he noted "a noticeable flattening of the lumbar spine" and "a lot of flatulence in the colon." Defendant then palpated Mrs. Myers' lower back to detect the presence of pain, swelling, or muscle spasm. After doing so, defendant concluded that Mrs. Myers had "an acute sacrolumbar sprain with subluxation [*i.e.*, muscle spasms caused by misalignment of the spine] and a right pelvic deficiency." Mrs. Myers was given ultrasound therapy and her right innominate bone was treated with an activator instrument (*i.e.*, an instrument held against the spine which exerts a light thrust upon a subluxated structure) in an attempt to get the bone to return to its normal position. Defendant could not recall assisting Mrs. Myers to her car after this treatment.

While testifying as an adverse witness during plaintiffs' case in chief, defendant admitted that, as shown by his billing, his treatment of Mrs. Myers was the same on August 25, 1983, as it was the previous day, August 24. The identical treatment bills for these dates were broken down as follows: $6 for "physical medicine treatment to one area; hot or cold packs" and $20 for "traction, manual," a total of $26 for treatment on each day. Defendant admitted that use of an

activator instrument is not manual traction and that manual traction is not manipulation. While testifying during his case in chief, defendant admitted that on August 25, 1983, he made "a right PD adjustment to [Mrs. Myers'] right sacroiliac joint and the right innominate bone" with an activator instrument. This admission was based upon an exhibit plaintiffs admitted during their case in chief (plaintiffs' exhibit 18, entitled "Patient Progress Report"). Although defendant recalled using an activator instrument during the August 25 treatment, plaintiffs' exhibit 18 makes no reference to use of an activator instrument until the treatment rendered the following day.

On August 26, 1983, defendant treated Mrs. Myers' lower back with ultrasound, hot hydrocular packs and ice packs, and a "right PD again which is an activator technique." Although defendant denied using hands-on manipulation on this date, his billing for treatment on this date as shown in plaintiffs' exhibit 23 was $6 for "physical medicine treatment to one area; hot or cold packs" and $18 for "manipulation by doctor." Mrs. Myers did not show up for an appointment she made with defendant for treatment the following day. Defendant denied using the "side roll" technique (i.e., patient lies on his side and technician brings leg up into chest area while contacting the specific vertebra he intends to adjust) during any of Mrs. Myers' three treatments. Defendant neither conducted nor recommended orthopedic or neurological examinations for Mrs. Myers.

Dr. Malcom Haber, a retired chiropractor, testified that while chiropractic is very effective in treating low back injuries, a chiropractor must differentiate between conditions suitable for chiropractic treatment and those suitable for medical treatment. In Dr. Haber's opinion, defendant deviated from acceptable community chiropractic standards (1) by failing to perform an orthopedic or neurological examination upon Mrs. Myers prior to first treatment, (2) by failing to refer Mrs. Myers to an orthopedist or a neurologist when she experienced pain during the first treatment, and (3) by failing to keep a sufficiently detailed record of his treatment of Mrs. Myers. Dr. Haber concluded that defendant's failure to perform orthopedic or neurological tests prior to manipulation "set the stage for the operation in the future [i.e., removal of the herniated disc] by rupturing or causing the disc between the vertebrae to bulge."

On cross-examination Dr. Haber stated that he relied upon Mrs. Myers' testimony regarding the manipulative techniques defendant allegedly performed upon her because she "would [not] be able to describe it so vividly had it not happened." Dr. Haber further testified that the use of an activator instrument would not disable a patient.

Dr. Marvin Engel, a chiropractor who treated Mrs. Myers for lower back pain on January 24, 1983, testified that he relieved some of the nerve pressure on her spine by "[turning Mrs. Myers] on her side and rotating her pelvis toward me." Dr. Engel further testified that while palpation of one's spine to detect muscle rigidity is not chiropractic manipulation, the treatment he performed upon Mrs. Myers was.

Plaintiffs raise two issues on appeal: (1) whether it was reversible error for the trial court to refuse to allow into evidence a hypothetical question propounded to Dr. Kenney and Dr. Kenney's answers thereto, and (2) whether defendant's reference during closing argument to facts allegedly not in evidence was so prejudicial as to require reversal.

The disputed hypothetical question propounded by plaintiffs to Dr. Kenney during Dr. Kenney's evidence deposition was used to solicit his opinion as to whether defendant's treatment of Mrs. Myers on August 24 and August 25, 1983, caused or contributed to causing the herniated disc. In pertinent part, this hypothetical question asked Dr. Kenney to assume that defendant performed a "manipulative procedure" upon Mrs. Myers' lower back during her first (August 24) and second (August 25) treatments. On the basis of these assumptions, Dr. Kenney testified that to a reasonable degree of medical certainty, defendant's treatments either caused or contributed to Mrs. Myers' herniated disc. The defendant's timely objection to this hypothetical and the follow-up questions was that plaintiffs had not established that defendant had performed a "manipulative procedure" upon Mrs. Myers during the second treatment. The trial court sustained defendant's objection and struck the entire hypothetical and the follow-up questions. The basis for the trial court's ruling was that plaintiffs failed to establish that the placing of hands upon Mrs. Myers' back during the second treatment was a "manipulative procedure" as defined by the chiropractic profession.

■ To assist the finder of fact, expert witnesses are allowed to give their opinions on scientific matters beyond the ordinary person's knowledge. (*Hernandez v. Power Construction Co.* (1978), 73 Ill. 2d 90, 99, 382 N.E.2d 1201, 1205.) They may answer hypothetical questions, but to keep their opinions from being mere conjecture, the hypothetical must be based on facts in evidence. It is the responsibility of the trial court to determine whether an assumed fact in a hypothetical question has a basis in the evidence. (*Grabner v. American Airlines, Inc.* (1980), 81 Ill. App. 3d 894, 898, 401 N.E.2d 1196, 1200.) When the admissibility of evidence depends upon other evidence, the

court has discretion to admit it subject to being "connected up." (See *Mitchell v. Sherman E. McEwen Associates, Inc.* (1935), 360 Ill. 278, 284, 196 N.E. 186, 188; see also Cleary and Graham, Handbook on Illinois Evidence sec. 611.1, p. 370 (4th ed. 1984).) Evidence admitted upon an assurance that it will later be connected up should be excluded upon failure to establish the connection. (See *People v. Smith* (1912), 254 Ill. 167, 173-74, 98 N.E. 281, 283; see also Cleary and Graham, Handbook of Illinois Evidence sec. 611.1, p. 370-71 (4th ed. 1984).) Furthermore, it is well established that the entire matter of the order of presentation of evidence and mode of witness examination must and does rest largely in the discretion of the trial court. See *People v. Waller* (1977), 67 Ill. 2d 381, 387, 367 N.E.2d 1283, 1285; see also Cleary and Graham, Handbook of Illinois Evidence sec. 611.1, p. 371 (4th ed. 1984).

■ The record in the case at bar establishes that on December 31, 1986, 14 days prior to the start of the trial, the trial court informed plaintiff that it was going to reserve its ruling upon the admissibility of the challenged hypothetical question pending the admission of evidence connecting it to the facts of the case. After reviewing the record, we conclude that such connection was not established prior to the trial court's ruling denying the admission of the challenged hypothetical question, nor was such connection ever made during plaintiff's case in chief. Although the evidence admitted during defendant's case in chief tends to establish such connection (*i.e.*, the admission by defendant that he treated plaintiff with an activator instrument), we must conclude under these circumstances that the trial court properly denied the admission of the challenged hypothetical question. Furthermore, we note that Dr. Kenney's answer to the follow-up question relating to the sudden onset of excruciating pain was that such sudden onset was probably precipitated by "manipulative procedures." Since the answer refers to "procedures" rather than one "procedure," the exclusion of the answer to this follow-up question was not an abuse of discretion.

■ ■ The final issue raised by plaintiffs in the instant appeal is that the trial court erred in permitting counsel for defendant to refer to facts not in evidence during closing argument. Specifically, plaintiffs object to defendant's statement in closing argument that Dr. Engel had, prior to defendant's treatment of Mrs. Myers, performed a "side roll" technique upon Mrs. Myers and that the treatment Mrs. Myers alleged she received from defendant was the very type of treatment she received from Dr. Engel. Defendant testified that the "side roll" is a leverage move for adjusting the spine or pelvis which

is performed by laying a patient on his side, bending the patient's leg up into the chest or abdominal area, and using the patient's own muscles as leverage to make the desired adjustment. Dr. Engel testified that he relieved nerve pressure on Mrs. Myers' spine by turning her on her side and rotating her pelvis toward him. Mrs. Myers testified that defendant performed "some kind of adjustments" upon her back and her legs while she was lying on her side.

During closing argument, counsel is permitted broad latitude to draw reasonable inferences and conclusions from the evidence. The scope of closing argument is within the sound discretion of the trial court. (*Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 519, 492 N.E.2d 1364, 1379.) After reviewing the record in the case at bar, we conclude that the challenged inferences defendant drew in closing argument were reasonable. Accordingly, the judgment of the circuit court of Marion County is affirmed.

Affirmed.

KARNS, P.J., and WELCH, J., concur.